Good morning your honors, may it please the court, my name is Jillian Harrington and I was assigned by the District Court to represent defendant appellant Raul Everardo Ledesma Abarca on this direct appeal. I did not represent Mr. Abarca in the District Court below. As your honors are of course aware, we raised three issues in Mr. Abarca's appellant's brief. The first issue was whether or not the government proved his guilt of the crimes charged beyond a reasonable doubt. The second is whether the District Court erred in allowing the expert testimony of a special agent regarding the means and methods of drug traffickers. And the final issue was whether or not the District Court erred in admitting two pieces of evidence as co-conspirator statements. I would like to begin today with the sufficiency of the evidence issue. Now as your honors are aware, Mr. Abarca was convicted of three drug related charges. And at trial, there was a lot of evidence that he was involved in drug dealing. But the major problem with the government's case is that the narcotics conspiracy and much of the evidence and testimony about his drug trafficking that was put in by the government was about drug trafficking and activities in Ohio, not in the Western District of New York. And no matter how hard the government tried to stretch its... Would you agree that there was evidence that this drug trafficking engaged in was also with his cousin Armando? You would agree there was evidence of that, right? Yes. All right. And there's also evidence that the storage locker, which is in the Western District of New York, that had cocaine in it, is associated with not only his cousin, but with his fingerprints on an item in the storage locker, right? Yes, your honor. There was actually his fingerprints were on two items. A sterilized set of drawers, which I think is like those plastic drawers people put in the closet, and a fan. So why isn't it a rational inference that... I mean, those were separate counts. I know those were counts two and three, but certainly they would also provide support for the conspiracy count. Why isn't that... There are other things that... I know he was sent to see this individual, Mr. Black, in the Western District. But just the storage locker alone, why isn't that enough for venue purposes? Well, because there's no... First of all, his fingerprints were not found on anything related to the cocaine. The cocaine was in bundles, no fingerprints on the cocaine. The cocaine was in a locked trunk. No, none of his fingerprints were on the trunk. There was also a... But his cousin is his co-conspirator, and certainly there's a lot of proof that that was, you know, his cousin's locker, right? Well, I don't think that that is a fact in evidence. I think that's an argument that the government made, was that it was rented by him, although the name on the contract was a different name, and that he was seen on surveillance. They have him making Western Union transfers at a Walgreens, right, you know, I think in the close proximity to the storage locker. I mean, there's a lot... They have surveillance of him in the Walgreens. But the issue remains is that as the district court judge recognized, and that's why he gave him a multiple conspiracies charge, there's no doubt that there was drug trafficking going on in Ohio, and there was drug trafficking going on in New York. The problem with the government's case is, are these separate circles? Are they concentric circles? Is there an overlap? If there's only an overlap of players, that doesn't make Mr. Abarca responsible for what the people were doing in the Western District. There are three things that the government pointed to to prove venue in the Western District. One, as Your Honor mentioned, were those fingerprints found on the two completely unrelated to drugs items that were in the storage locker. And the second thing, which Your Honor also mentioned, was his cousin Armando's presence in the Western District at the Walgreens. And the third thing was a conversation that a cooperating drug dealer, Mr. Bilardo, made that he asked Mr. Abarca... That would be a completely different case. I understand. Well, but Ms. Harrington, I think one possible implication of that question, could he be convicted of this conspiracy that was described in the indictment if the charge was brought in Ohio? The answer has to be yes, right? Well, it would have to be framed differently. Why would it have to be framed differently if the allegations were, here he is, he's engaged in a conspiracy that has tentacles reaching to Tennessee and whatever else, but a lot of it is centered right here in Columbus, Ohio. And if the jury believed that absolutely the Columbus part, I don't know for sure about these other things, wouldn't that be sufficient to convict him of this conspiracy? In other words, would the jury have to be instructed that in order to convict on this conspiracy, you have to find that each and every piece was something that Mr. Abarca was personally involved in? Well, no, that's not the law of conspiracy. That's not the law. Of course. So this conspiracy could be proven in Columbus. The issue here is really a venue issue and the relevance of that in part is that the venue prong of conviction only needs to be proved by a preponderance of the evidence. Yes? Yes, Your Honor. That is absolutely true, but we can't try a case for conduct based in Ohio if we can't link Mr. Abarca to it here. We can link it to perhaps other parties, but it's very possible and I would argue likely and perhaps probable that his cousin Armando was engaged in activity with other people. You mentioned Mr. Bellotto. Mr. Bellotto testified that I told him to make contact with the other person he was giving drugs to beside your client in the Western District. So clearly if that's credited, your client knew there was a portion of this case of this conspiracy that related to Buffalo. He says he sent him to talk to reestablish contact with that individual and that he did reestablish. He couldn't remember the details of what he reported back, but it's a fair inference that that happened, right? Well, I mean, first of all, there's no evidence, no phone records, no anything, no travel records to show that A, this conversation ever happened. B, other than Bellotto's testimony. I know, but you know the jury doesn't need phone records to believe Mr. Bellotto. You know that. Of course, we don't know truly what the substance of that conversation was. Again, the jury can can believe that we don't know that he went. I mean, everybody wants to gloss over the fact of whether or not he went. We don't know that Bellotto told him that it was related to drugs. We don't we don't know any of that. And if that's what we're hanging a conspiracy charge with such a heavy sentence on, it seems really tenuous. These three items that Bellotto's claim, Armando being here and fingerprints on plastic drawers, that is really, really a thin case. All right. You want to spend a minute on the expert testimony issue? I mean, of course, I would be happy to turn my attention to that. As far as the expert testimony goes, and I'll be very brief. We know that the law, as it stands, says that the government is permitted to present this type of testimony. There's no argument about that. But the argument that we present today is that the use by the government of this type of testimony has just gone too far. As a criminal defense attorney, I see it in every case now, regardless of whether or not it's needed, it's necessary to help the jury. In this case, this was a in terms of the drugs themselves, take out the venue part and that complication. As far as the drugs were concerned, it was pretty simple. It was in kilo quantities. We didn't need this special agent testifying about how it gets broken down and how they add additives and how it's then sold on the streets. We just didn't need that kind of testimony. We only had kilos. So it doesn't matter how it was distributed and when it came down to that. Wasn't it pretty limited? I think it was like 13 pages of testimony, so it was pretty limited. I understand what you're saying, but it wasn't like the expert went on and on, certainly didn't mention your client, didn't analyze anything particular about this case. He didn't. But then why did we need him? And the fact that it was only 13 pages, I don't think that really should be dispositive because he's a special agent. In the DEA, working for the federal government. So just him getting up there and being given the label of an expert and testifying about all of this, about why drug dealers have multiple cell phones. That's not something that the jury couldn't have figured out. Why drug dealers use apps like Facebook Messenger and iMessage and WhatsApp? Again, not something that we needed an expert to go. I know that I'm over my time, so I'll rely on my brief for the rest. Thank you. Thank you, Ms. Harrington. We'll hear now from Ms. Richards. May it please the court. My name is Monica Richards. I represent the United States on this appeal as the appellee. With regard to the sufficiency of the evidence, having listened to the court's questions. Can I ask you a preliminary question, which may be inappropriate and you can decline to answer? Why was this case brought in the Western District of New York rather than Ohio, if it's possible to answer that? It does seem strange to spend a whole lot of time when we're going through these papers trying to somehow intuit what we're doing in Buffalo or Amherst, New York, when so much is happening in Columbus, Ohio. You don't? I don't have the exact answer to the charging document in the manner in which the case. I do know how the case originated, the investigation and why it was here to begin with. I mean, this was just happenstance that these 43 kilograms of cocaine were found in a storage locker that was put up for auction. Surely that's the answer. It's 43 kilos is the reason why it was brought in Buffalo. And if you brought the case in Columbus against Mr. Abarca, you'd have to somehow you'd still have to do this linking up in order to get the drugs on the table with what's going on in the Western District of New York. Moreover, I have rarely seen agents or U.S. attorneys happily give up a case to another district where there was a seizure of 43 kilos in their district of illegal drugs. And that's the politics of the Justice Department. 42 kilos. 42, whatever. No, no, no. In any event, I do see it that way, generally speaking. But and I think that that's the point that we wouldn't have been able to charge the possession counts either. We would have had a different problem with regard to the possession counts if we were trying it in a different venue. So charges two and three, the premises, which is not the most serious, obviously, count three, but count to the possession charge. Forty three kilos. We would not have been able to charge in under the Ohio as we did as a possession. It would have certainly been part of the conspiracy had we done it there. But I'm sorry to divert you. But I think that's the point. I appreciate that. I appreciate the court. The court's focus on that and the concerns with regard to what's where the right place might have been or the correct place. But it doesn't mean that this was the wrong place here. It's a proof by a preponderance of the evidence and the preponderance. The evidence standard is different than what we normally are dealing with in these cases in terms of proof beyond a reasonable doubt. But the evidence is made. There was significant evidence, as indicated by Judge Bianco's questions, that this was there were there were actual fingerprints in the storage locker where the item, whether or not they were on the particular items is one thing we could talk about all day. But they were indeed in the storage locker and small space. And we have also the other evidence to include Mr. Bayardo's testimony that he sent the defendant to Buffalo, that he was familiar with his customer in Buffalo, Mr. Black, that there was ongoing dealings that Mr. Bayardo had with Mr. Black and Buffalo, and that he sent Mr. Bayardo there specifically to make that contact again after he lost his phone number. So those things by preponderance, the evidence the government relied on in its proof and the jury was correctly instructed on that. It came up a couple of times. The judge actually raised the issue. And during a charge conference and it was addressed and the charge was given as was the multiple conspiracies charge. So the jury here did have both of those instructions and found the defendant guilty where it was properly charged. And there's no challenge to the charge here. So with regard to the reasonable foreseeability also has been addressed with regards to count to specifically where there was another defendant who or another co-conspirator. I'm sorry, who was involved, whose presence in the Western District of New York was established by different means. Also fingerprints, though, also Western Union, also on video surveillance. Those items all do tend and support the government's position that this was provable. Bending here was provable by a foreseeable that it was reasonable foreseeable that the defendant knew that the events, the conspiracy extended here. Unless there's further questions on that, I would just quickly turn to the expert opinion. And with regard to that matter, this court found the same sort of evidence in other cases, use of manner and use of phones, manner and use of packaging. Those sort of things have historically been represented. I challenge my colleague's assertion that everybody knows how WhatsApp is used and why it's different. And why Blackberry Messenger is different than a text or a phone call or an email in terms of the ability to be traced and discovered when phones or other electronic tablets are searched. That is something that's unusual, and the district court made a proper finding on that. The other point would just be that here we can say, I heard my opponent say it again, why did we need that? Why bother? Well, because maybe they didn't believe Mr. Bayardo. Maybe they didn't believe the other co-conspirator. We don't know what the jury was going to do when it went into that jury room. And if they chose not to believe them, credibility was amply and sufficiently attacked with regard to their plea deals and their cooperation agreements. And so whether or not the jury was going to find them credible with regard to those manners and methods and means was something that expert testimony was appropriate for. And also given the attack on their credibility was appropriate in this court, it's found that multiple times along the way in its history of decisions on expert testimony in such cases. Those are cited in my brief. Unless there's further questions, I'd rest. I don't think there are any other questions. Thank you, Ms. Richards. Ms. Harrington, you have one minute in rebuttal. If your Honours have no additional questions, I'd be happy to rest on my brief. I think we reviewed everything. All right. Thank you to both of you. We appreciate it. Have a good day. Thank you, your Honours.